UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| 3M COMPANY,<br><br>Plaintiff,<br><br>V.<br><br>GLENN M. HAMMOND, *et al.*,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 6:26-CV-034-REW-MAS<br><br><br><br>OPINION & ORDER |

*** *** *** ***

Plaintiff 3M Company ("3M") commenced this action by filing a complaint against Defendants Glenn M. Hammond, Michael B. Martin, and Johnny Givens. *See* DE 1 (Complaint); *see also* DE 40 (Amended Complaint). The operative Amended Complaint asserts two civil RICO claims (one substantive and one conspiracy), along with claims of fraud and civil conspiracy under Kentucky law. *See* DE 40 at 107-13. Before the Court are Defendants' motions to dismiss the Amended Complaint. *See* DE 63 (Givens's Motion to Dismiss); DE 64 (Hammond's Motion to Dismiss); DE 66 (Martin's Motion to Dismiss). Those motions are ripe for review.

Defendants also moved to stay discovery pending resolution of their motions to dismiss. *See* DE 68 (Givens's Motion to Stay); DE 69 (Martin's Motion to Stay); DE 70 (Hammond's Motion to Join Givens's Motion to Stay). However, those motions now are moot, as the Court herein resolves the dismissal effort. Accordingly, the Court **DENIES** DEs 68 and 69.

Finally, 3M recently moved the Court to take judicial notice of "significant developments in the underlying dust mask cases." DE 88 (Motion for Judicial Notice). As grounds, 3M states that the depicted case progression "strongly supports the allegations in 3M's RICO complaint."

*Id.* at 1. This information, in the Court's view, is contested advocacy and has no real bearing on the sufficiency of 3M's allegations under the Rule 12(b)(6) rubric, the focus at the dismissal stage. Thus, the Court **DENIES** DE 88. Recently filed DE 93 is also mooted by the result of this order as to which 3M's substantive authority was not dispositive.

As seems to be true with all aspects of 3M mask litigation, this case presents a challenging lift. 3M targets the RICO bazooka at lawyers that initiated 22 complaints against it, encompassing some 850 underlying product liability plaintiffs. 3M alleges that a portion of the plaintiffs' roster intentionally included claimants the lawyers knew did not have proper claims and yet were joined as part of a scheme to defraud 3M. 3M asserts many misrepresentations, by Defendants, as to that subset of tort plaintiffs. The scheme is alleged to include fraudulent behavior and deceptive intent, shared by the lawyers at issue, across the origination, pursuit, representation in, and culmination of the claims from the tainted subset. The Court has many questions about the ultimate factual viability of the case but will not, at this stage and on this record, dismiss it.

In reaching this decision, the Court has read the full docket, to include 3M's Complaint, the controlling Amended Complaint, all dismissal briefing (Martin's motion, Hammond's motion, Givens's motion, the 3M consolidated response, all replies) and the satellite briefing related to additional authority and judicial notice. The laconic, it's clear, have no seat at the table in mask litigation.

## I. Background (based on allegations from the Amended Complaint)

The Amended Complaint is a 114-page (not paragraph) tome, a testament to the bar's difficulty making "a short and plain statement" of the pleader's claim under Rule 8(a)(2). The gist is that lawyers Hammond (of Kentucky), Martin (of Texas), and Givens (of Mississippi) joined forces to sue 3M in tort on behalf of hundreds of coal miners and their kin. The miners allegedly

used 3M respirators during their mining careers and later developed black lung. The undertaking eventually encompassed 22 separate suits across several Kentucky counties. Some of the cases were effectively removed to this Court. The headcount for plaintiffs originally was 850+ across the 22 complaints. The gravamen is product liability as to defectiveness of 3M's respirators, or "dust masks," in the argot.

But this case focuses on the lawyers and an aliquot of the claims, primarily as a civil RICO matter. 3M alleges a RICO conspiracy among and substantive predicates by the lawyers, and seeks relief under that powerful statute.

The Defendants in this case are Glenn Hammond, Michael Martin, and Johnny Givens, three attorneys residing and practicing in Kentucky, Texas, and Mississippi, respectively. *See* DE 40 ¶¶ 11, 16, 18. 3M, a corporation that produces respirators, or "dust masks," alleges that Defendants created a RICO enterprise engaged in the filing and prosecuting of fraudulent dust mask claims[1] for the purpose of increasing the inventory of total mask cases against 3M, thereby increasing 3M's defense costs, litigation risk exposure, and incentive to enter into large, lucrative, and mass settlements. *See id.* ¶¶ 4, 45. The alleged scheme starts with Defendant Hammond and client solicitation. 3M alleges that Hammond, or his employees at his direction, mass solicited or cold-called individuals for a potential dust mask claim against 3M. *See id.* ¶ 61. Hammond allegedly instructed and encouraged certain claimants to make false statements during the intake process. *See id.* ¶¶ 62-64. 3M also alleges that Hammond later instructed individuals whose claims could face statute of limitations issues to file more current intake paperwork (after having seen Hammond previously) to thwart such defensive issues. *See id.* ¶¶ 66-68.

[1] The general theory of the dust mask claims, one hotly contested by 3M, is that the 3M respirators failed to properly protect coal workers from inhalation of coal dust, which caused coal workers' black lung disease. *See id.* ¶ 28.

Between March 2020 and February 2023, Defendants filed 22 complaints against 3M, covering over 850 claims on behalf of coal workers, their estates, or their families. *See id.* ¶¶ 69-91. However, according to 3M, "this case is about a particular subset of those cases that 3M recently discovered were knowingly and fraudulently prosecuted by the Defendants, who aligned together and with others through an unlawful enterprise, for the purpose of furthering a massive, cross-state, scheme to defraud 3M." *Id.* ¶ 32; *see also id.* ¶¶ 112-17. 3M broadly alleges that the fraudulent claims contain false statements of claimed injury, *see id.* ¶¶ 92-95, false claims of mask usage, *see id.* ¶¶ 96-97, false identification of 3M dust masks, *see id.* ¶¶ 99-101, and/or false claims of statute of limitations compliance, *see id.* ¶¶ 102-11. The Amended Complaint depicts Hammond as the originator of the bulk of the complaints and Martin and Givens as joining and assisting in their prosecution. *See id.* ¶ 69. 3M also alleges various forms of fraud by Defendants throughout discovery, such as by falsifying medical authorization forms, providing false interrogatory responses, and encouraging false deposition testimony. *See id.* ¶¶ 122-30. Falsity contentions with respect to representation status, the chronology of lawyer involvement, and client consultation also feature in the Amended Complaint. *See, e.g., id.* ¶¶ 59, 119.

The core? 3M alleges the lawyers sought and schemed to ensure claim volume, irrespective of claim merit. Thus, "[a] core purpose of the Enterprise was to increase the inventory of cases . . . against 3M to increase the amount of money 3M would have to spend . . . and the risk exposure 3M would assign. . . and thereby increase the pressure on 3M to settle cases. . . ." *Id.* ¶ 45. Volume also meant dilution of attention by 3M and a chance to pursue mass settlements, where the wheat and chaff were more difficult to sort. *Id.* ¶ 207; 44-48. Null cases could serve as "bargaining chips" that the lawyers would "dismiss or settle at nuisance value" in exchange for settlement of

"larger more valuable claims." *Id.* at ¶ 131. 3M avers "Defendants schemed to include within their inventory a large number of entirely fraudulent claims." *Id.* at ¶ 46.

Defendants allegedly attempted to conceal the scheme or discovery of the scheme in various ways. Between July 2021 and December 2022, Defendants caused the dismissal of 16 allegedly fraudulent claims and the late cancellation of depositions in many cases, all in an effort to prevent revelation of the scheme. *See id.* ¶¶ 135-37. On January 17, 2023, Defendant Martin allegedly, and presumably inadvertently, mistakenly texted counsel for 3M a message, in which Martin "lamented that Defendant Hammond was 'hurting our clients with real claims because *so many are frivolous*.'" *Id.* ¶ 149 (emphasis in Amended Complaint, added to message). As the scheme began to unravel and in further efforts to conceal, on January 27, 2023, Defendants initiated the dismissal of 43 claims. *See id.* ¶¶ 154-56. However, due to 3M's opposition to these without-prejudice motions and Defendants' consequent concern that their concealment efforts would fail, they moved to withdraw their dismissal motions and re-bury them in the mass inventory of cases. *See id.* ¶ 160. On March 24, 2023, Defendants Martin and Givens filed 12 "virtually identical" motions to stay, each of which contained allegedly false statements, in an effort to distance themselves from Defendant Hammond and the Enterprise. *See id.* ¶¶ 163-67. The Pike Circuit Court's findings with respect to Hammond's fraudulent conduct in a pending mask case, involving the statute of limitations, was a catalyst and inflection point in this sequence. *See, e.g.*, ¶¶ 127-29. Then, on April 5, 2023, in a last-ditch attempt to conceal the scheme and distance themselves from the fraudulent claims, Martin and Givens moved to withdraw from hundreds of dust mask claims they had prosecuted with Hammond against 3M. *See id.* ¶¶ 178-79.

Further, near the end of March 2023, Defendant Hammond allegedly stashed away in a secret location certain dust mask case files potentially containing evidence of fraudulent filings, in order to prevent their contents from coming to light. *See id.* ¶ 188-90.[2]

3M filed the instant action on June 13, 2025, *see* DE 1, and amended their complaint on August 6, 2025, *see* DE 40. Each Defendant moved to dismiss 3M's Amended Complaint. *See* DE 63; DE 64; DE 66. Those motions are fully briefed and ripe for decision.

To be clear, 3M does not here allege malpractice or shoddy or ill-founded lawyering. It does not allege, merely, the lack of adequate cause or substance in the suspect claims. 3M alleges criminal fraud—that the lawyers formed a conspiracy that involved "specific intent to defraud" in filing and pursuing the 22 Enterprise Complaints. *Id.* at ¶ 112. As alleged, "Defendants . . . intentionally engaged in a scheme intended to deprive 3M of money through fraud, deceit, and artifice knowing that interstate mails and wires would be used to further the scheme. Each Defendant knew and understood that at times each Defendant would and did cause false statements to be made for purposes of executing the scheme." *Id.* at ¶ 196.

## II. Legal Standard

Defendants move to dismiss 3M's claims under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. *See* DE 63; DE 64; DE 66. To survive a motion to dismiss under Rule 12(b)(6), the plaintiff must allege facts that, if accepted as true, "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 127 S. Ct. at 1967). If the non-moving party's

[2] These documents are the subject of an Emergency Motion for Preservation made by 3M, *see* DE 18, which the Court granted, *see* DE 32.

pleading does not do so, or if the non-moving party is barred from recovering on its claims as a matter of law, then dismissal is warranted. *See League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (citing *Twombly*, 127 S. Ct. at 1969). The Court must "construe the complaint in the light most favorable to the plaintiff" and "accept all well-pleaded factual allegations as true[.]" *Gaines v. Cross*, 168 F.4th 403, 406 (6th Cir. 2026).

Ordinarily, a district court is not permitted to consider matters beyond the complaint when considering a motion to dismiss under Rule 12(b)(6). *See Wershe v. City of Detroit, Mich.*, 112 F.4th 357, 372 (6th Cir. 2024). If the district court does consider matters beyond the complaint, the normal procedure is to "convert the motion to dismiss into a motion for summary judgment." *Id.* However, a court may consider "exhibits attached to the complaint, exhibits attached to the motion to dismiss briefing, items in the record, or public records without converting the motion to dismiss when these items 'are referred to in the [c]omplaint and are central to the claims contained therein.'" *Id.* at 372-73 (quoting *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008)).

Caselaw does not explicitly alter the 12(b) standard or define different conventions to follow when the Court analyzes permissible outside material, but cases are specific that the Complaint should be the Court's primary consideration. "In determining whether to grant a Rule 12(b)(6) motion," a court should "primarily consider[] the allegations in the complaint." *Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir. 2001) (citing *Nieman v. NLO, Inc.*, 108 F.3d 1546, 1554 (6th Cir.1997)). However, "matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account." *Elec. Merch. Sys. LLC v. Gaal*, 58 F.4th 877, 883-84 (6th Cir. 2023) (citing *Amini*, 259 F.3d at 502). While no specific standard details *how* Courts should weigh or take these materials into account, cases state

that judges may "rel[y] upon", "consider", and "examine" such matters along with the rest of the complaint. *See Passa v. City of Columbus,* 123 F. App'x 694, 697 (6th Cir. 2005); *Elec. Merch. Sys. LLC*, 58 F.4th at 884; *Fellows v. Am. Campus Communities Servs., Inc.*, No. 4:16-CV-01611 JAR, 2017 WL 2881121, at *3 (E.D. Mo. July 6, 2017). As noted, "[t]he majority of . . . courts . . . have held that the use of such documents is proper only for the fact of the documents' existence, and not for the truth of the matters asserted therein." *Passa*, 123 F. App'x at 697. The Court hews to this paradigm.

The Court has considered the scope of materials properly metered to this standard—ultimately, the Rule 12 test queries whether a party has stated a claim, a matter centrally focused on pleading adequacy and the inferences reasonably drawn in favor of the pleading party.

## III. Analysis

Defendants, through separate motions, raise an assortment of grounds for dismissal, some overlapping and some Defendant-specific.[3] The Court, after careful consideration, allows the RICO claims to proceed but dismisses the state law claims.

### A. Civil RICO Claims (Counts I & II)

3M alleges two civil RICO violations, one substantive and one for conspiracy. DE 40 at 107-110. Congress created a civil cause of action for RICO violations in 18 U.S.C. § 1964(c). *See In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 483-84 (6th Cir. 2013). To state a viable civil RICO claim, a plaintiff must plead a defendant's violation of 18 U.S.C. § 1962, causation, and injury to the plaintiff's business or property. *See HPIL Holding, Inc. v. Zhang*, 734 F. Supp. 3d

[3] Not every Defendant raises every argument, but the Court has endeavored to consider the full field: The Court thus screens the Amended Complaint against defense theories centered on adequacy of RICO allegations (substantively and as to conspiracy), adequacy of Kentucky fraud allegations, standing, *Noerr-Pennington* immunity, putative predicate status for litigation-related conduct, *Younger* abstention, and Kentucky's judicial statements privilege.

664, 684 (E.D. Mich. 2024) (citing *In re ClassicStar Mare Lease Litig.*, 727 F.3d at 484). To establish the first element, a § 1962 violation, the plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 404 (6th Cir. 2012) (citing *Sedima, S.P.R.L. v. Imrex Co.*, 105 S. Ct. 3275, 3285 (1985)); *see also* 18 U.S.C. § 1962(c) ("It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."). A claim of conspiracy to commit civil RICO under § 1962(d) requires "[t]he same four elements" plus "'the existence of an illicit agreement to violate the substantive RICO provision.'" *Marinac v. Todd*, No. 1:20-cv-1571, 2022 WL 3904049, at *8 (N.D. Ohio Aug. 30, 2022) (quoting *Aces High Coal Sales, Inc. v. Cmty. Bank & Trust of W. Ga.*, 768 F. App'x 446, 459 (6th Cir. 2019)).

To sufficiently allege "conduct" of an enterprise, the plaintiff must allege that "the defendant participated in the 'operation or management' of the enterprise." *Ouwinga v. Benistar 419 Plan Servs., Inc.*, 694 F.3d 783, 794 (6th Cir. 2012) (quoting *Reves v. Ernst & Young*, 113 S. Ct. 1163, 1172 (1993)). An enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). A "pattern" of racketeering activity is defined as "at least two acts of racketeering activity" within a ten-year period. 18 U.S.C. § 1961(5). "Racketeering activity" consists of, as pertinent, acts indictable under a federal statute enumerated in 18 U.S.C. § 1961(1)(B). *See Heinrich*, 668 F.3d at 404. That iteration includes Title 18 mail fraud and wire fraud (§§ 1341 and 1343) along with obstruction of justice under § 1503 and 1512(c).

The Court declines to dismiss Counts I and II on Defendant Martin's threshold standing challenge. *See* DE 66 at 16-17. Martin argues that 3M has not alleged causation or a cognizable injury.[4] As for the injury, 3M alleged that it incurred litigation costs traced to defense against fraudulent claims; such costs would represent a cognizable RICO injury to business or property. *See Slorp v. Lerner, Sampson & Rothfuss*, 587 F. App'x. 249, 263 (6th Cir. 2014) (finding attorney's fees incurred recoverable in civil RICO action). Martin also challenges the causal component, arguing that if 3M has not alleged a viable RICO predicate act, they have not alleged causation. The Court addresses the viability of 3M's predicate act allegations below and will therefore not analyze it in the standing context. Causation—that claims pursued as part of a fraudulent scheme caused 3M to incur defense costs—is plausibly stated and indeed an alleged operational target of the scheme.

3M alleges that Defendants committed the predicate acts of mail and wire fraud. *See* DE 40 at 103. Mail fraud (under § 1341) and wire fraud (under § 1343) are enumerated offenses under § 1961(1)(B) and, therefore, can serve as predicate acts of racketeering activity to establish civil RICO liability. *See In re ClassicStar Mare Lease Litigation*, 727 F.3d at 483. "Mail and wire fraud consist of (1) a scheme or artifice to defraud; (2) use of the mails or interstate wire communications in furtherance of the scheme; and (3) intent to deprive a victim of money or property." *Slorp*, 587 F. Appx. at 264 (citing *United States v. Turner*, 465 F.3d 667, 680 (6th Cir. 2006); *United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003)). "A scheme to defraud is any plan or course of action by which someone intends to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises." *In re ClassicStar Mare*

[4] In order to have Article III standing, "(1) the plaintiff must have suffered an 'injury in fact,' (2) that injury must be 'fairly traceable' to the defendant's challenged conduct, and (3) it must be likely that the plaintiff's injury would be redressed by the requested relief." *Slorp v. Lerner, Sampson & Rothfuss*, 587 F. Appx. 249, 253 (6th Cir. 2014) (citing *Lujan v. Defenders of Wildlife*, 112 S. Ct. 2130, 2136 (1992)).

*Lease Litig.*, 727 F.3d at 484 (internal citations and ellipses omitted). "A plaintiff must also demonstrate scienter to establish a scheme to defraud, which is satisfied by showing the defendant acted either with a specific intent to defraud or with recklessness with respect to potentially misleading information." *Heinrich*, 668 F.3d at 404. 3M also alleges that Defendants (through Hammond but in furtherance of the conspiracy) committed obstruction of justice under 18 U.S.C. §§ 1503[5] and 1512(c)[6], which are both itemized under § 1961(1)(B). *See* DE 40 at ¶ 200.

The sufficiency of mail and wire fraud allegations in a civil RICO claim implicates the heightened pleading standard of Rule 9(b). *See Heinrich*, 668 F.3d at 404; *Blount Fin. Servs., Inc. v. Walter E. Heller & Co.*, 819 F.2d 151, 152–53 (6th Cir. 1987). Rule 9(b) requires a party "alleging fraud or mistake" to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy Rule 9(b), the plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Heinrich*, 668 F.3d at 404. In other words, a plaintiff asserting a claim of fraud must, "'allege the time, place, and content of the alleged misrepresentation' and 'the fraudulent scheme; the [defendant's] fraudulent

---

[5] Penalizing "[w]hoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States magistrate judge or other committing magistrate, in the discharge of his duty, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, magistrate judge, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice[.]" 18 U.S.C. § 1503.

[6] Penalizing "[w]hoever corruptly (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or (2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so[.]" 18 U.S.C. § 1512(c).

intent; and the [resulting] injury.'" *Koliminsky v. Root, Inc.*, 100 F.4th 675, 684 (6th Cir. 2024) (cleaned up) (quoting *Bennett v. MIS Corp.*, 607 F.3d 1076, 1100 (6th Cir. 2010)).

The Court finds the RICO element and predicate act allegations in the Amended Complaint sufficiently specific and legally adequate. The pleading details an enterprise centered on a racketeering pattern that infused 360 degrees of the litigation process. Thus, 3M alleges, with granular examples, falsity in the intake and enrollment process. 3M alleges falsity in the establishment and management of client representation, with specific instances of alleged prevarication regarding the scope and timing of representation. 3M alleges falsity (across the pleadings and the resulting discovery processes, interrogatories and depositions included) as to critical claim aspects—the use of cookie cutter pleading forms that alleged known false contentions regarding facts germane to claim accrual (thus, limitations), to respirator usage, to 3M-mask involvement, and to confirmed black lung or medical diagnoses regarding injury. The Court won't rehearse the 114 pages, but suffice it to say that the Amended Complaint provides detailed exemplars in each category, referencing specifics acts, by Defendants, across the full array of 22 Enterprise Complaints and many designated claimants within the allegedly tainted pool. As to the RICO components (a § 1962 violation through enterprise, association, pattern of racketeering activity, with resulting injury to business, hewing to the factors and requisites in *Boyle v. United States*, 129 S. Ct. 2237, 2244 (2009) and RICO conspiracy (an agreement to violate § 1962(c)), the Amended Complaint passes muster.[7]

[7] To some extent, 3M's allegations invoke "information and belief." "And although complaints grounding claims on 'information and belief' can survive a motion to dismiss, they 'must set forth a factual basis for such belief[.]'" *Smith v. Gen. Motors LLC*, 988 F.3d 873, 885 (6th Cir. 2021) (quoting *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 878 (2006)). 3M, where it relies on information and belief (which is not, in any way, the whole of the Amended Complaint), frames the allegations within a sturdy scaffold of particular facts and references, buttressing the legitimacy of the averments.

*Litigation-related conduct may qualify as a RICO predicate.*

Each Defendant pins much on the concept that RICO essentially excludes the potential for litigation-related conduct to serve as a predicate act. Givens and Hammond treat this as nearly a categorical rule, *see* DE 63 at 22-23, DE 64 at 19, while Martin leaves open the potential for "corrupt" behavior, even relative to litigation, to qualify as a predicate act. *See* DE 66 at 2 (requiring "specific allegations of corruption by each defendant").

Certainly, there is a tone of palpable reluctance across the courts when weighing application of RICO to lawyering. The Sixth Circuit has spoken little on the topic but did specifically reject an attempt to convert unjustified litigation into a federal RICO claim. *See Melton v. Blankenship*, No. 08-5345, 2009 WL 87472 (6th Cir. Jan. 13, 2009) (unpublished). In *Melton*, the plaintiffs brought civil RICO claims asserting predicate acts of mail and wire fraud in connection with a counterclaim and bankruptcy petition brought by the defendants in underlying litigation, alleged to contain fraudulent representations. *See id.*, at *1. Affirming the district court's dismissal of the civil RICO claims, the Sixth Circuit explained, "[t]o the extent that defendants were overly zealous or malicious, the remedy lies in a state law action for malicious prosecution or abuse of process, not in a federal RICO claim." *Id.*, at *3. The Court viewed the plaintiffs' claim as "in effect alleging that defendants engaged in malicious prosecution and abuse of process, and that they used the mails and wires to do so by filing Blankenship's counterclaim and bankruptcy petition." *Id.* Importantly, the *Melton* Court distinguished the alleged conduct (characterized as "merely offering legal advice" or as offering "conventional advice to a client or performing ordinary legal tasks") from conduct properly within RICO. *Id.* at *2. In *Melton*, the allegations amounted only to "malicious prosecution or abuse of process," which would be outside

RICO's ambit.[8] *Id.* at *3. A RICO plaintiff "must assert predicate acts described in 18 U.S.C. § 1961(1), and they have not done so." *See id.* at *4. *Melton* does not, by its terms, stand for the proposition that a properly pleaded predicate is not cognizable because of the litigation context.

Other circuits have parsed the concept. In *Kim v. Kimm*, a case out of the Second Circuit, the plaintiff alleged that defendants "completed false paperwork to pose as the owners of a trademark, licensed the trademark to a third-party, and then sued [the plaintiff] for violating the licensing agreement." 884 F.3d 98, 101 (2d Cir. 2018). The plaintiff claimed the defendants committed the predicate acts of mail fraud, wire fraud, and obstruction of justice by preparing, signing, and filing four declarations "with full knowledge that they contained fraudulent representations intended to persuade the district court" to find in their favor. *Id.* at 103. The Second Circuit held "that allegations of frivolous, fraudulent, or baseless litigation activities—without more—cannot constitute a RICO predicate act." *Id.* at 104.

The Second Circuit in *Kim* distinguished *Sykes v. Mel Harris & Assocs., LLC*, 757 F. Supp. 2d 413 (S.D.N.Y. 2010), where a district court denied the defendants' motion to dismiss a § 1962(c) claim. *Kim*, 884 F.3d at 104-05.

> The plaintiffs in *Sykes* alleged that the defendants engaged in a "massive scheme," in which a debt-buying company, a law firm, a process-serving company, and others conspired with one another by buying consumer debt, initiating actions

[8] Importantly here, under Kentucky law, the torts of malicious prosecution and abuse of process center on lack of probable cause and a purpose or goal other than proper claim adjudication. *See Martin v. O'Daniel*, 507 S.W.3d 1, 11-12 (Ky. 2016) ("A malicious prosecution action may be established by showing that: 1) the defendant initiated, continued, or procured a . . . civil judicial proceeding . . . against the plaintiff; 2) the defendant acted *without probable cause*; 3) the defendant acted with malice, which . . . in the civil context, means seeking to achieve *a purpose other than the proper adjudication of the claim* upon which the underlying proceeding was based; 4) the proceeding, except in ex parte civil actions, terminated in favor of the person against whom it was brought; and 5) the plaintiff suffered damages as a result of the proceeding") (emphasis added); *Garcia v. Whitaker*, 400 S.W.3d 270, 276 (Ky. 2013) (holding that the essential elements of an abuse of process claim under Kentucky law are "(1) an *ulterior purpose* and (2) a willful act in the *use of process not proper* in the regular conduct of the proceeding") (citing *Simpson v. Laytart*, 962 S.W.2d 392, 394 (Ky.1998)) (emphasis added).

> against the debtors and improperly serving them, and then filing fraudulent documents in state court to obtain default judgments. Accordingly, even though those defendants used litigation to carry out their scheme, they also engaged in a variety of other out-of-court actions to further this activity. In the case at bar, by contrast, the entire alleged scheme involved the creation of fraudulent court documents.

*Id.* at 105 (internal citations omitted). *Kim* stated its approach as cabined to litigation-specific conduct in a "single frivolous, fraudulent, or baseless lawsuit." *See id.*

As *Kim* did, many courts navigating the line invoke catalyzing policy reasons for the particular result. For example, the Fifth Circuit warned that "prosecuting litigation activities as federal crimes would undermine the policies of access and finality that animate our legal system. Moreover, allowing such charges would arguably turn many state-law actions for malicious prosecutions into federal RICO actions." *Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 525 (5th Cir. 2016) (quoting *United States v. Pendergraft*, 297 F.3d 1198 (11th Cir. 2002)). The Eighth Circuit similarly cautioned that permitting a federal RICO claim based on litigation acts "'would result in the inundation of federal courts with civil RICO actions that could potentially subsume all other state and federal litigation in an endless cycle where any victorious litigant immediately sues opponents for RICO violations." *UMB Bank, N.A. v. Guerin*, 89 F.4th 1047, 1055 (8th Cir. 2024) (citing *Curtis & Assocs., P.C., v. Law Offices of David M. Bushman, Esq.*, 758 F. Supp. 2d 153, 173 (E.D.N.Y. 2010)).

Numerous federal courts around the country, under these precedents, have likewise rejected extending RICO liability to allegedly fraudulent litigation, absent allegations of an independent, larger scheme or sufficient criminality. *See, e.g.*, *Acres Bonusing, Inc. v. Ramsey*, No. 19-CV-5418, 2022 WL 17170856, at *11 (N.D. Cal. Nov. 22, 2022) ("In the wake of *Kim*, district courts from around the country have found that litigation activities will not serve as predicate acts unless there are allegations of wrongdoing outside of the litigation, such as out-of-court activity or

corruption."); *Daddona v. Gaudio*, 156 F. Supp. 2d 153, 162 (D. Conn. 2000) (collecting cases); *Verschleiser v. Frydman*, No. 22-cv-7909 (JGK), 2023 WL 5835031, at *13 (S.D.N.Y. Sept. 7, 2023) (collecting cases); *Neal v. Second Sole of Youngstown, Inc.*, No. 1:17-cv-1625, 2018 WL 340142, at *5 (N.D. Ohio Jan. 9, 2018); *Pompy v. Moore*, No. 19-10334, 2024 WL 845859, at *16 (E.D. Mich. Feb. 28, 2024); *UMB Bank, N.A. v. Benton*, No. 21-00832-CV-W-BP, 2022 WL 16753765, at *8 (W.D. Mo. June 29, 2022); *Nolan v. Galaxy Scientific Corp.*, 269 F. Supp. 2d 635, 643 (E.D. Pa. 2003); *Paul S. Mullin & Assocs., Inc. v. Bassett*, 632 F. Supp. 532, 540 (D. Del. 1986); *Curtis & Assocs., P.C.,* 758 F. Supp. 2d at 173-76.

The Court has read all of the circuit cases and notes several important things.

First, as 3M points out, the RICO action is statutory, and nothing in RICO purports to exempt conduct occurring within litigation as categorically withdrawn from predicate territory. Indeed, many predicates explicitly touch the court process, including obstruction of justice, witness tampering, destruction of evidence, and witness retaliation. Plainly, the text of RICO has demanding gates to walk, but merely invoking a litigation umbrella provides no broad shield against RICO. *See, e.g., Living Designs, Inc. v. E.I. Dupont de Nemours and Co.*, 431 F.3d 353, 364 (9th Cir. 2005) (rejecting argument "that a party's litigation conduct . . . is entitled to absolute immunity and cannot form the basis of a subsequent federal civil RICO claim"); *Guerin*, 89 F.4th at 1055 (rejecting concept that "litigation activities can *never* serve as a RICO predicate" but finding "conclusory, unpersuasive assertions" inadequate).

Second, with no textual basis to define the scope of a litigation carve-out, the Court finds any limiting principle somewhat ineffable. As in *Melton* in the Sixth Circuit, what the cases actually seem to do, foundationally, is scrutinize whether the conduct alleged meets the predicate act elements. For example, in *Deck v. Engineered Laminates*, 349 F.3d 1253, 1257 (10th Cir.

2003), the circuit court carefully applied the elements of extortion (§ 1951) and witness tampering (§ 1512) to a case involving abusive litigation. The court rejected the predicates over *elemental* deficiencies, not through a blanket preclusion based on context. *See id.* ("We must, however, disregard two of the alleged predicate acts."). Importantly, settlement related conduct, connected to the litigation, survived as mail and wire fraud "proper predicate acts" after elemental analysis. *See id.* at 1259. Similarly, in *Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 525 (5th Cir. 2016), the court strictly screened for sufficient allegations of criminality, noting that "bad faith litigation absent corruption" cannot "sustain civil-RICO claims" and requiring that civil-RICO "liability should not exist unless the pleadings allege actual criminal activity." Thus, because the complaint at issue alleged merely non-criminal obstructive acts, rather than criminally culpable "corruption," the predicate bar stood unmet. *See id.* at 524 ("Southern Snow has not pleaded sufficient facts to establish either alleged criminal act."); *see also Pendergraft*, 297 F.3d at 1209 (criminal case, discussing perjurious litigation documents, declining to apply mail fraud predicate given absence of "intent to deceive"). Finally, *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1088 and n.2 (11th Cir. 2004) again sifted § 1951 and the mail-fraud statute to find the absence of a sufficient allegation of "wrongful" conduct (or, as to mail fraud, any "intent to deceive") in a "threat to litigate" that included "fabrication of evidence behind the lawsuit." The cases scour the predicate elements, and simply put, "[t]here exists no broad shield from RICO for attorney advocacy, including in the litigation context." *In re Outlaw Lab'y, LP Litig.*, No. 18-CV-840-GPC-BGS, 2020 WL 3469387, at *3 (S.D. Cal. June 25, 2020).

Here, 3M alleges each wire and mail fraud element: a scheme to defraud, material misrepresentations or concealment, intent to defraud, and a federal jurisdictional hook. This goes far beyond lawyer advice or typical advocacy and far beyond the mere contours of tortious acts

that might be deemed state law malicious prosecution or abuse of process. 3M contends the three lawyers banded together, accumulated an inventory of cases known to be factually flawed in one or more ways, and filed cases incorporating those flawed cases (girded by lies about their character) in specific ways and with specific purposes in mind. Thus, as alleged, they made representations regarding mask usage, 3M mask usage, diagnosed injuries, and temporal awareness or claim accrual. 3M claims the volume of cases—facilitated by inclusion of the known meritless claims—was a target of the lawyers, a means of upping risk to 3M and benefitting the lot of claimants.

And again, consider some of the recited details. As summarized earlier, 3M alleges that the lawyers corruptly induced claimants to identify 3M or misstate accrual knowledge, that the lawyers manipulated or falsified intake dates to evidence, reset accrual facts, and that the lawyers pleaded claims as timely when they knew the allegations were false.[9] 3M alleges the lawyers alleged confirmed diagnoses, knowing many of the claimants had no such diagnoses. DE 40 ¶ 155.

And a few exemplar vignettes of note: First, Martin texted a communication that plausibly recognizes that many, "so many," of the filed claims generated by Hammond were frivolous. The plain and plausible conflict between that acknowledgement and the lawyers' management of and truth behind aspects of the litigation is significant.[10] Second, Hammond allegedly hid—

[9] The complaint in 20-CI-382 at ¶ 13 alleged Plaintiffs "were not aware more than one year prior to the filing of this Complaint…and were not possessed of information from which they ought to have been aware of both the nature of their injuries and their causal connection to the defective dust masks." 3M pleads specific falsity as to various claimants named in that document. *See* Amended Complaint ¶¶ 103-04. The Court agrees that filing a time-barred claim is not (given the defensive nature of limitations) fraudulent, but lying about accrual facts or falsely manipulating proof of accrual is a different stripe of behavior.

[10] The Court recognizes Martin's counterpoint—that he openly professed and pursued a sort of post-filing claim vetting that would result in dismissal of cases that should not have been filed. There also is some tension between how 3M characterizes the scheme (case volume inflating value) and Martin's text (frivolous claims hurting value). Rule 12 is not a context that allows the resolution of things like intent,

intentionally secreted—relevant documents as the Pike Circuit scrutiny ramped up. Third, the lawyers allegedly lied, including to identified claimants, about reasons for dismissals, and they allegedly took dishonest stances before the state court regarding whom they represented and when. Such troubling instances contribute to, in one view, a perception of rot within the lawyers' joint undertaking. These matters sound in the type of corruption *Snow* suggested may move a case addressing litigation conduct into the realm of RICO.[11]

The Court finds the criminal elements, to include sufficiently numerous and connected predicate acts qualifying under § 1961, adequately pleaded.

*The* Noerr-Pennington *Doctrine does not preclude the action.*

Defendants argue that the *Noerr-Pennington* doctrine immunizes their conduct and bars 3M's suit entirely. The First Amendment's Petition Clause grants private actors the right to petition the government for action. U.S. Const. amend. I ("Congress shall make no law … abridging … the right of the people … to petition the Government for a redress of grievances.").

---

and the Court views the inferences in 3M's favor as plausible at this step. The record, even viewed to include consideration of Martin's dismissal practices, does not foreclose 3M's theory as a matter of law.

[11] Black's Law Dictionary defines "corruption" as "an act carried out with the intent of giving some advantage inconsistent with official duty or the rights of others." *Corruption*, BLACK'S LAW DICTIONARY (12th ed. 2024). Few courts have examined what constitutes "corruption" under *Snow*. Those that have considered the issue have found that filing a frivolous lawsuit, alone, is insufficient. More fraudulent activity is necessary to qualify as corruption. For example, the Northern District of Texas listed "witness tampering" as a form of corruption which could trigger RICO's applicability. *CADG Erwin Farms, LLC v. Ipour*, No. 3:22-cv-02896-M, 2024 WL 134501, at *7 (N.D. Tex. Mar. 31, 2024). The Fifth Circuit found a scheme where the Defendant filed fraudulent liens against a judge in retaliation for his sentence, then sued the clerk's office employees to induce them to file the false leans, constituted "corruption" under *Snow*. *See United States v. Strother*, No. 21-40592, 2023 WL 7399550, at *5 (5th Cir. Nov. 8, 2023). The Northern District of New York analogized *Snow* "corruption" to a criminal RICO case where seven attorneys were found guilty of filing fraudulent personal injury suits. The attorneys engaged in a pattern of mail fraud and witness bribery by pursuing counterfeit claims by pressuring accident witnesses to testify falsely, paying individuals to testify falsely, paying unfavorable witnesses not to testify, and creating false evidence for use before and during trial. *See Carroll v. U.S. Equities Corp.*, 2020 WL 11563716, at *9 (N.D.N.Y. Nov. 30, 2020) (citing *United States v. Eisen*, 974 F.2d 246, 251 (2d Cir. 1992)). 3M's contentions enter the territory of *Snow* corruption.

The *Noerr-Pennington* doctrine generally provides private actors petitioning the government, including courts, immunity from litigation in connection with their protected petitioning activity. *See VIBO Corp., Inc. v. Conway*, 669 F.3d 675, 683-84 (6th Cir. 2012). The doctrine derives its name from *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 81 S. Ct. 523 (1961), and *United Mine Workers v. Pennington*, 85 S. Ct. 1585 (1965), two cases arising in the antitrust context. "The essence of the doctrine . . . is that 'parties who petition the government for governmental action favorable to them cannot be prosecuted under the antitrust laws even though their petitions are motivated by anticompetitive intent.'" *Campbell v. PMI Food Equipment Grp., Inc.*, 509 F.3d 776, 790 (6th Cir. 2007) (internal citations omitted) (quoting *Video Int'l Prod., Inc. v. Warner-Amex Cable Commc'ns, Inc.*, 858 F.2d 1075, 1082 (5th Cir. 1988)).

The doctrine has expanded to protect First Amendment petition rights beyond the antitrust context. *See Wilder v. Hall*, 501 F. Supp. 2d 887, 895 (E.D. Ky. 2007) (collecting cases). The Sixth Circuit, for example, considered the doctrine in a § 1983 action. *See Eaton v. Newport Bd. of Educ.*, 975 F.2d 292, 298 (6th Cir. 1992) ("Under the *Noerr-Pennington* doctrine, liability may not be assessed under § 1983 or the anti-trust laws except in very limited circumstances, for actions taken when petitioning authorities to take official action, regardless of the motives of the petitioners, even where the petitioning activity has the intent or effect of depriving another of property interests.") (citing *Video Int'l Prod., Inc.*, 858 F.2d at 1084). Other circuits have analyzed and applied the doctrine in civil cases alleging RICO violations. *See generally Sosa v. DIRECTV, Inc.*, 437 F.3d 923 (9th Cir. 2006) (applying *Noerr-Pennington* in a civil RICO action); *Bath Petroleum Storage, Inc. v. Mkt Hub Partners, L.P.*, 229 F.3d 1135 (2d Cir. 2000) (unpublished table decision) (same); *Int'l Bhd. of Teamsters, Local 734 Health and Welfare Trust Fund v. Philip Morris, Inc.*, 196 F.3d 818 (7th Cir. 1999). *Noerr-Pennington* immunity may also bar state law

claims. *See Campbell*, 509 F.3d at 790 ("Although the *Noerr–Pennington* doctrine was initially recognized in the antitrust field, the federal courts have by analogy applied it to claims brought under both state and federal laws, including common law claims of tortious interference.").

The Court finds, initially, that *Noerr-Pennington* applies to the petitioning activity at issue in this case: litigation and conduct incidental to litigation.[12] *See Opdyke Inv. Co. v. City of Detroit*, 883 F.2d 1265, 1273 (6th Cir. 1989) ("The doctrine is based on a right of petition that extends also to exercise of the right to petition courts for judicial relief."); *see also Sosa*, 437 F.3d at 932-33 (applying doctrine to conduct incidental to litigation under "breathing space" principle). Other courts have applied the doctrine in the RICO context. *See EQMD, Inc. v. Farm Bureau Gen. Ins. Co. of Mich.*, No. 19-13698, 2021 WL 843145, at *4 (E.D. Mich. Mar. 5, 2021).

But, if *Noerr-Pennington* initially applies to 3M's civil RICO claims and state law claims, 3M still may advance the doctrine's "sham exception." *See* DE 74 at 20. The Supreme Court established a two-part definition for "sham" litigation, involving an objective and subjective component:

> First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*, and an antitrust claim premised on the sham exception must fail. Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals an attempt to interfere directly with the business relationships of a competitor, through the use of the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon. This two-tiered process requires the plaintiff

---

[12] 3M largely does not dispute the applicability of *Noerr-Pennington*. However, it argues that the protection should not immunize Defendants' pre-suit client solicitation. DE 74 at 27-29. The Court disagrees. In *Racetech, LLC v. Ky. Downs, LLC*, 169 F. Supp. 3d 709, 715-16 (W.D. Ky. 2016), the court was faced with whether to apply *Noerr-Pennington* immunity to pre-litigation communications with third parties, which did not culminate in a lawsuit. The court applied the doctrine, finding the conduct sufficiently related to the protected petitioning conduct to warrant the protection. *See id.* at 716. The Court views the communications identified by 3M as sufficiently connected to the protected petitioning so as to fall within the *Noerr-Pennington* orbit.

> to disprove the challenged lawsuit's legal viability before the court will entertain evidence of the suit's economic viability.

*Prof. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 113 S. Ct. 1920, 1928 (1993) (quotations, footnote, and internal citations omitted) (emphasis removed). A "classic example" of sham petitioning is "the filing of frivolous objections to the license application of a competitor, with no expectation of achieving denial of the license but simply in order to impose expense and delay." *City of Columbia v. Omni Outdoor Advert., Inc.*, 111 S. Ct. 1344, 1354 (1991) (citing *California Motor Transp. Co. v. Trucking Unlimited*, 92 S. Ct. 609 (1972)). It is a sham when a person's actions "are 'not genuinely aimed at procuring favorable government action' at all[.]" *Id.* (quoting *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 108 S. Ct. 1931, 1937 n.4 (1988)).[13]

---

[13]And given that Defendants filed 22 separate actions against 3M, each characterized as an Enterprise Complaint, the more forgiving "series" test may more properly govern the "sham exception" analysis. *Relevant Grp., LLC v. Nourmand*, 116 F.4th 917, 929 (9th Cir. 2024) distinguished single-action scenarios from ones involving a "whole series of legal proceedings." The Court grouped the tests as follows:

> *Professional Real Estate Investors* provides a strict two-step analysis to assess whether a single action constitutes sham petitioning. This inquiry is essentially retrospective: If the suit turns out to have objective merit, the plaintiff can't proceed to inquire into subjective purposes, and the action is perforce not a sham.
>
> *California Motor Transport* deals with the case where the defendant is accused of bringing a whole series of legal proceedings ... [It] recognized that the filing of a whole series of lawsuits and other legal actions without regard to the merits has far more serious implications than filing a single action, and can serve as a very effective restraint on trade. When dealing with a series of lawsuits, the question is not whether any one of them has merit—some may turn out to, just as a matter of chance—but whether they are brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival. The inquiry in such cases is prospective: Were the legal filings made, not out of a genuine interest in redressing grievances, but as part of a pattern or practice of successive filings undertaken essentially for purposes of harassment?

*Id.* at 929 (quoting *USS–POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades Council*, 31 F.3d 800, 810–11 (9th Cir. 1994) ). Certainly, 3M's characterization of the fraudulent claims, which it avers the lawyers well knew the characteristics of, would meet the sham test under the series of proceedings approach.

3M argues that it sufficiently pleaded the objective part of the sham exception, and the Court agrees. Again, 3M must allege objective baselessness, meaning "no reasonable litigant could realistically expect success on the merits." *Prof. Real Est. Invs., Inc.*, 113 S. Ct. at 1928. 3M alleges that "many" or "a subset" of Defendants' claims were brought on behalf of individuals who (contrary to known facts) did not wear a respirator, did not wear a 3M-manufactured respirator, did not suffer from black lung disease, and/or whose claims were known to be barred by the one-year statute of limitations. *See* DE 74 at 21-23 (citing DE 40 ¶¶ 53-57, 62-64, 66-68, 92-95, 106-110, 117, 127, 155-157).

Surely, any product defect claim against 3M brought by a plaintiff who did not use a respirator, and specifically 3M's respirator, is objectively baseless. The same is true for a plaintiff with no cognizable injury, also a required element of a product defect claim. *See id.* In these circumstances, no reasonable litigant could expect success on the merits or possess "a reasonable belief that there is a chance that a claim may be held valid upon adjudication." *Prof. Real Est. Invs., Inc.*, 113 S. Ct. at 1928 (cleaned up). Again, it is Martin's text that referred to "so many" frivolous claims.

Though not as straightforward, 3M plausibly alleged objective baselessness with respect to the subset of "fraudulent" claims barred by the one-year statute of limitations. *See Fluke Corp. v. LeMaster*, 306 S.W.3d 55, 60 (Ky. 2010) (citing Ky. Rev. Stat. Ann. § 413.140(1)(a) for the one-year SOL principle). The statute of limitations is an affirmative defense that must be pleaded and proved by the party asserting it, *see Wimmer v. City of Ft. Thomas*, 733 S.W.2d 759, 761 (Ky. Ct. App. 1987), and there are certain instances where the statute of limitations may be tolled or waived, for example, such that a claim could proceed despite it being brought outside the limitations period. Even so, Defendants do not argue that any such obstacle to the defense

applied.[14] As such, in the Court's view, where a claim is patently barred by the statute of limitations and there is nothing at issue that would defeat or complicate the SOL defense, a reasonable litigant could not expect success on the merits. Therefore, the Court finds that, especially given Martin's frivolousness recognition, the objective component is met with respect to the allegedly fraudulent claims.

As for the subjective part of the sham exception, 3M alleges that Defendants filed the objectively baseless claims with the intent to increase the inventory of cases against 3M, drive up 3M's litigation expenses and liability exposure, and ultimately force 3M into larger settlements. *See* DE 74 at 24; DE 40 ¶¶ 7-8, 44-48, 131-136, 207. 3M alleges each Defendants' knowing involvement, with Hammond instituting most claims and Martins and Givens prosecuting them along with Hammond. *See* DE 74 at 23; DE 40 ¶¶ 38, 62-68, 106, 113-127, 149, 170. 3M specifically avers that the lawyers bargained using the fraudulent claims, employing them as "bargaining chips," to be dropped "in exchange for 3M agreeing to settle" other claims. *See id.* ¶ 131.

Martin disputes any subjective impropriety in the petitioning activity and argues that he behaved diligently and in good faith to dismiss any meritless claims. *See* DE 66 at 10-12; DE 81 at 2. He contends that various hearing transcripts in the predicate litigation can and should be

---

[14] Defendant Martin notes that a five-year statute of limitations applies to the claims of fraud brought against 3M. *See* DE 66 at 2 n.1. As 3M notes, though, timeliness is but one aspect alleged to be fraudulent. Further, the Court wonders why the lawyers would specifically plead that underlying plaintiffs' claims had accrued less than one-year before filing if they rested with any substantiality on fraud as the catalyzing theory. Importantly, as the Court sees it, the notion of fraud as a salvaging theory did not pertain in the Individual 74 litigation described with painstaking and disturbing detail in the Amended Complaint, *e.g.*, DE 40 at ¶¶ 163-64. And, again, the Court focuses on the falsity alleged. 3M contends that the lawyers made blanket contentions regarding timeliness, mask use, and medical diagnoses and that the contentions, as to the crucial subset, were knowingly false. Crediting those details, which the Court must do at this stage, yields sham or non-genuine litigation. Further, the scheme as depicted—that sham claims would up the value of other claims—fits squarely in the *PREI* second prong.

considered by the Court at this juncture, to prove his intent. DE 66 at 5, 9-12. "[T]he court may, in undertaking a 12(b)(6) analysis, take judicial notice of 'matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint.'" *Elec. Merch. Sys. LLC*, 58 F.4th at 883 (quoting *Golf Vill. North, LLC v. City of Powell*, 14 F.4th 611, 617 (6th Cir. 2021)). However, "[c]ourts may consider public records for the truth of the statements contained within them only when the 'contents prove facts whose accuracy cannot reasonably be questioned.'" *Id.* (quoting *Passa*, 123 F. App'x at 697).

The Court already recognized the counter-inferences Martin has suggested. 3M says Martin so acted not in good faith, but out of concern that the scheme would be discovered, ultimately in furtherance of and to conceal the scheme. DE 40 ¶¶ 135-136. Thus, neither the colloquy nor the procedural parleys themselves defeat the sham exception. The Court finds that 3M's Amended Complaint sufficiently alleges that objectively baseless claims were subjectively made for an improper purpose. This contested record, with a difficult chronology and obvious cross-characterizations, is not the place to resolve the pursuing lawyers' intent. 3M's allegations and resulting inferences, plausible even accounting for the full context, resolve the motion at this stage.

Finally, Defendant Hammond argues that for the sham exception to apply, the proponent must argue that the entire lawsuit was baseless, not just certain claims. *See* DE 80 at 11 (citing *Ashley Furniture Indus., Inc. v. Am. Signature, Inc.*, No. 2:11-cv-427, 2015 WL 12999664, at *5 (S.D. Ohio Mar. 12, 2015)). *Ashley Furniture* is only persuasive authority, and the Court disagrees with the principle, which evidently stems from *VAE Nortrak N. Am., Inc. v. Progress Rail Servs. Corp.*, 459 F. Supp. 2d 1142, 1166 (N.D. Ala. 2006), a case out of the Northern District of Alabama interpreting *Noerr-Pennington*. Applying this logic, a litigant could defeat the sham exception by

including merely one legitimate theory in a lawsuit containing hundreds of fraudulent claims. Notwithstanding that *Professional Real Estate Investors, Inc.* provides that the "lawsuit" must be objectively baseless, it would be unsound to apply the exception so narrowly to include within its coverage only lawsuits that are 100% baseless. The allegedly sham litigation at issue in this case—a number of fraudulent claims interspersed in mass action litigation to up the settlement value and litigation costs—exemplifies the issue with interpreting the exception so rigidly. The Court will not follow this path. *See Ultraclear Epoxy, LLC v. Epodox USA Corp.*, No. 3:23-cv-00715, 2024 WL 966876, at *11 (M.D. Tenn. Mar. 6, 2024) (noting that had the court applied *Noerr-Pennington*, the court "could not dismiss…because Epodex has plausibly alleged that *at least some* of the takedown notices at issue would fall within that doctrine's sham exception.") (emphasis added); *Heritage Guitar, Inc. v. Gibson Brands., Inc.*, Np. 1:20-cv-229, 2022 WL 1954361, at *9 (W.D. Mich. June 6, 2022) (applying dominant theory to mixed-claim case and holding the sham exception applied when "all but one" of defendant's counterclaims and pre-litigation conduct were "objectively baseless"). Further, the serial proceedings test obviously admits of some portion of the series having validity; this cuts against parsing claim merit in the way Hammond advocates. *See, e.g., USS-POSCO Indus.*, 31 F.3d at 810-11 ("[E]ven a broken clock is right twice a day.").

In sum, the Court finds that *Noerr-Pennington* does initially apply to the conduct alleged in the Amended Complaint, but that the sham exception to the doctrine precludes immunity.

### B. *Younger* Abstention

Defendant Hammond, but not Martin or Givens, contends that *Younger* abstention requires dismissal of the Amended Complaint in its entirety. *See* DE 64 at 11. Though federal courts are generally obligated to exercise jurisdiction where it lies, "in certain circumstances, allowing a federal suit to proceed threatens 'undue interference with state proceedings,' and the proper course

is for the federal court to abstain from entertaining the action." *Aaron v. O'Connor*, 914 F.3d 1010, 1016 (6th Cir. 2019) (quoting *Sprint Commc'ns., Inc. v. Jacobs*, 134 S. Ct. 584, 588 (2013)). Such "exceptional" circumstances exist only in "state criminal prosecutions," "civil enforcement proceedings," and "civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions." *Sprint*, 134 S. Ct. at 588 (citing *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 109 S. Ct. 2506, 2518 (1989)).

The Sixth Circuit follows a two-step inquiry to determine if *Younger* abstention applies. *Woodcock v. Univ. of Kentucky*, No. 26-5057, 2026 WL 2472872, at *2 (6th Cir. Aug. 24, 2026). First, the Court asks if the state proceeding falls into one of the three *Sprint Commc'ns* "exceptional" categories: "(1) state prosecutions, (2) civil enforcement proceedings, and (3) civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions.'" *Id.* (citation omitted). The category two civil enforcement proceedings are those "akin to a criminal prosecution." *Doe v. Univ. of Kentucky*, 860 F.3d 365, 368 (6th Cir. 2017). If the state proceeding fits into one of the three "exceptional" categories, then the Court considers additional factors: "whether (1) the underlying state proceedings are 'ongoing'; (2) the proceedings implicate important state interests; and (3) there is an adequate opportunity to raise constitutional challenges in the underlying proceeding." *Woodcock*, 2026 WL 247872, at *2; *see also Eidson v. Tennessee Dept. of Children's Serv.*, 510 F.3d 631, 638 (6th Cir. 2007).

Hammond does little at step one, and the Court sees no exceptional category, relative to a pending state matter. State tort claims are not criminal prosecutions. They are not civil enforcement proceedings akin to criminal prosecution. Nor are they civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial

functions. Because Hammond's tort suits do not fit into an "exceptional" category, the Court finds it unnecessary to reach step two. Further, some of the subject matter is not pending in state court at all. This is simply not a case where *Younger* abstention is relevant. Therefore, Defendant Hammond's *Younger* argument fails.

**C. State Law Claims of Fraud and Civil Conspiracy[15] (Counts III & IV)**

**i. Fraud**

3M asserts a claim of fraud under Kentucky common law against all Defendants. *See* DE 40 at 110. In order to establish a claim of fraud under Kentucky law, "the party claiming harm must establish six elements of fraud by clear and convincing evidence as follows: a) material representation b) which is false c) known to be false or made recklessly d) made with inducement to be acted upon e) acted in reliance thereon and f) causing injury." *United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999). While Kentucky law governs substantive issues, Rule 9(b)'s pleading standard applies to the allegations of fraud. *See Greer v. Strange Honey Farm, LLC*, 114 F.4th 605, 613-14 (6th Cir. 2024).

3M alleges, "Defendants made material misrepresentations to 3M in the Enterprise Complaints." *Id.* ¶ 220. 3M proceeds to discuss the types of misrepresentations those complaints

[15] 3M contends that the Court has diversity jurisdiction over the claims brought under Kentucky law (Counts Three and Four) pursuant to 28 U.S.C. § 1332. DE 74 at 15. In an apparent attempt to establish the citizenship component of § 1332(a)(1), 3M alleges each Defendants' residency. *See* DE 40 ¶¶ 11, 16, 18. The Court reminds 3M that citizenship hinges on domicile, not residence. *See Mason v. Lockwood, Andrews & Newnam, P.C.*, 842 F.3d 383, 391 (6th Cir. 2016) (acknowledging that "the place of residence is *prima facie* the domicile," while also stressing that "allegations of mere residence may not be equated with citizenship" (quoting *Reece v. AES Corp.*, 638 F. App'x 755, 769 (10th Cir. 2016))). Moreover, there are concerns with the amount-in-controversy requirement of § 1332(b). 3M claims "millions" in damages from litigating the 850+ claims brought by Defendants against 3M, but at various points throughout the complaint, 3M clarifies that they view only a subset or portion of the 850+ claims as fraudulent, certainly reducing their total damages figure. *See* DE 40 ¶¶ 32, 48, 58. Indeed, in Count I, 3M explains that the alleged scheme involved "fabricating and filing *dozens* of fraudulent product liability claims." *Id.* ¶ 211 (emphasis added). Could defending "dozens" of lawsuits result in more than $75,000 in litigation costs? The Court, based on a "fair reading" of 3M's complaint, answers yes. *See US Framing Int'l LLC v. Continental Building Co.*, 134 F.4th 423, 429 (6th Cir. 2025).

contained, *see id.* ¶¶ 220-21, how the misrepresentations were material, *see id.* ¶ 222, Defendants' knowledge with respect to the misrepresentations, *see id.* ¶ 223, Defendants' intent that 3M rely on the misrepresentations, *see id.* ¶ 224, and 3M's actual reliance and causal injury, *see id.* ¶¶ 225-26. Clearly then, 3M premises its state law fraud claim exclusively on statements in the dust mask complaints filed by Defendants.

Defendants invoke Kentucky's judicial statements privilege in arguing 3M's fraud claim must be dismissed. 3M counters that Kentucky's judicial statements privilege law does not apply. In their view, federal privilege law applies because the Amended Complaint asserts both federal and state law claims. However, Kentucky law provides the rule of decision on those claims, so Kentucky privilege law applies as well, per Fed. R. Evid. 501.

The Kentucky judicial statements privilege provides that "statements in judicial proceedings are absolutely privileged when material, pertinent, and relevant to the subject under inquiry, though it is claimed that they are false and alleged with malice." *Maggard v. Kinney*, 576 S.W.3d 559, 567 (Ky. 2019).

> As its name implies, it is a privilege and, therefore, precludes the use of those privileged communications to sustain a cause of action. It does not bar the cause of action but only renders it unsustainable if based exclusively on statements privileged under the law. Generally stated, it affords an absolute privilege to statements made "preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as a part of a judicial proceeding" and that have "some relation to a proceeding that is contemplated in good faith and under serious consideration." It applies with equal force to statements in pleadings filed in judicial proceedings.

*Halle v. Banner Industries of N.E., Inc.*, 453 S.W.3d 179, 184 (Ky. Ct. App. 2014) (internal citations omitted). In *Halle*, the Kentucky Court of Appeals applied the judicial statements privilege to claims of fraud, concluding that "the judicial statements privilege shields the speaker from claims for fraud in the inducement based on the statements made preliminary to, or in the institution of, or during a judicial proceeding if those statements were material, pertinent, and

relevant to the judicial proceeding." *Id.* at 188-89. Though the privilege is an affirmative defense, an affirmative defense "may be the basis for dismissal under Rule 12(b)(6) when the facts are definitively ascertainable from the pleadings and conclusively establish the affirmative defense." *Walburn v. Lockheed Martin Utility Servs., Inc.*, 443 F. Appx. 43, 47 (6th Cir. 2011) (citing *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 613 (6th Cir. 2009)). Such is the case here.

3M does not contest the privilege's applicability to the dust mask complaints, arguing only that other fraudulent conduct alleged by 3M falls outside the privilege. This argument contravenes the Amended Complaint, which plainly and unambiguously premises the state law fraud claim on the material misrepresentations made to 3M *in the Enterprise Complaints*. *See* DE 40 ¶¶ 219-25. Accordingly, because the statements on which 3M premises its state law fraud claim clearly fall within Kentucky's judicial statements privilege, the Court will dismiss Count III. The claim hinges on, and only on, privileged statements, so dismissal is apt. *See Adams v. Lexington-Fayette Urb. Cnty. Gov't*, 154 F.4th 501, 513 (6th Cir. 2025) (dismissing state law defamation claim, pleaded as relying only on content of privileged charging document, after stating: "[P]laintiff must therefore allege that the press release contained defamatory statements beyond those included in the charging documents. Because they have not done so, their defamation claim fails.").

**ii. Civil Conspiracy**

3M's fourth claim against Defendants is for civil conspiracy under Kentucky common law. *See id.* at 112. Civil conspiracy consists of "a corrupt or unlawful combination or agreement between two or more persons to do by concert of action an unlawful act, or to do a lawful act by unlawful means." *Peoples Bank of N. Ky., Inc. v. Crowe Chizek & Co.*, 277 S.W.3d 255, 260-61 (Ky. Ct. App. 2008) (quoting *Smith v. Bd. of Educ. of Ludlow*, 264 Ky. 150, 94 S.W.2d 321, 325 (1936)). 3M's civil conspiracy claim fails because civil conspiracy "is not a stand-alone claim but

a theory upon which a plaintiff can recover from multiple defendants for underlying intentional tort claims." *Johnson v. BLC Lexington SNF, LLC*, No. 5:19-064-DCR, 2019 WL 2476739, at *15 (E.D. Ky. June 13, 2019); *see also Christian Cnty. Clerk ex rel. Kem v. Mortg. Elec. Registration Sys., Inc.*, 515 F. App'x 451, 458-59 (6th Cir. 2013) (collecting cases). Thus, because the underlying fraud claim fails to state a claim, the civil conspiracy claim, untethered to any extant state tort other than accompanying Count III, by default fails. Accordingly, the Court will dismiss Count IV.

## IV. Conclusion

The RICO claims persist. Judge Stinnett shall implement a case schedule when the pleadings close, and discovery shall commence under his management.

The Court **DENIES** in part and GRANTS in part DE 63, 64, and 66;

The Court **DENIES**, as moot, DE 68, 69, 88, and 93.

This the 30th Day of September, 2026

**Signed By:**
***Robert E. Wier*** REW
**United States District Judge**